| | |
|---|---|
| B&L MANAGEMENT GROUP, LLC,<br><br>    Plaintiff,<br><br>v.<br><br>WILLIAM C. ADAIR,<br>and JACQUELINE ADAIR,<br><br>    Defendants. | No. 17-2197 |

## MEMORANDUM OPINION FINDINGS OF FACT AND CONCLUSIONS OF LAW

Defendant William C. Adair ("William")[1] told the members of B&L Management Group, LLC ("B&L") that he owned a large tract of land in western Tennessee and northern Mississippi. After a rail-yard was built nearby, William said he was going to develop some of the tract into an industrial, commercial, and logistics park. In return for B&L's consulting services on the development project, William promised to pay B&L fifteen percent of each sale of land in the park. When B&L eventually demanded payment, William refused to pay. B&L then learned that William had never owned the land at issue and had no authority to sell it. On that basis, B&L brings a claim for intentional misrepresentation against William.

---

[1] For clarity and brevity, this Memorandum Opinion will refer to Defendants William Adair and Jacqueline Adair by their first names.

B&L also brings a civil conspiracy claim against William and Defendant Jacqueline Adair ("Jacqueline"). B&L asserts that William and Jacqueline conspired to defraud B&L by making hundreds of illegitimate financial transfers among various business entities and individuals. B&L alleges that those transfers were designed to make William appear insolvent and to hinder B&L's ability to collect on a judgment against William.

B&L filed a Complaint against William on March 20, 2017. (ECF No. 1.) B&L filed its Second Amended Complaint against William and Jacqueline on April 5, 2018. (ECF No. 128.) B&L seeks compensatory and punitive damages. The Court held a four-day bench trial beginning on January 22, 2019, and concluding on January 25, 2019. As required by Rule 52 of the Federal Rules of Civil Procedure, the Court sets forth its findings of fact and conclusions of law based on that trial.

For the following reasons, B&L's claim against William Adair for intentional misrepresentation is GRANTED. B&L is entitled to $589,356.90 in damages from Defendant William Adair. B&L's claim against William and Jacqueline Adair for civil conspiracy is DENIED.

## I. Jurisdiction & Choice of Law

The Court has diversity jurisdiction under 28 U.S.C. § 1332. Federal district courts have original jurisdiction of all civil actions between citizens of different states "where the matter in

controversy exceeds the sum or value of $75,000, exclusive of interest and costs." 28 U.S.C. § 1332(a)(1).

Plaintiff B&L Management Group, LLC is a Tennessee limited liability company, whose two members reside in Tennessee. (ECF No. 175 at 933.) See V & M Star, LP v. Centimark Corp., 596 F.3d 354, 356 (6th Cir. 2010) ("[L]imited liability companies 'have the citizenship of each partner or member.'" (quoting Delay v. Rosenthal Collins Grp., LLC, 585 F.3d 1003, 1005 (6th Cir. 2009))). B&L is a citizen of Tennessee. Defendants William Adair and Jacqueline Adair are residents and citizens of Mississippi. (ECF No. 175 at 933.) The parties are completely diverse.

B&L alleges that the amount in controversy exceeds $75,000. (Id.) "[T]he sum claimed by the plaintiff controls if the claim is apparently made in good faith." St. Paul Mercury Indem. Co. v. Red Cab Co., 303 U.S. 283, 288 (1938); accord Charvat v. NMP, LLC, 656 F.3d 440, 447 (6th Cir. 2011). The requirements of diversity jurisdiction are satisfied.

State substantive law applies to state-law claims brought in federal court. See Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938). Where, as here, there is no dispute that a certain state's substantive law applies, the Court will not conduct a choice-of-law analysis sua sponte. See GBJ Corp. v. E. Ohio Paving Co., 139 F.3d 1080, 1085 (6th Cir. 1998). The parties assumed at trial and in their respective memoranda that Tennessee substantive law

applies to B&L's state-law claims and have made their arguments accordingly. The Court will apply Tennessee substantive law to B&L's state-law claims.

## II. Findings of Fact

Defendant William Adair is a "well-known regional business-man" who formed Direct Insurance Company in 1991. (ECF No. 175 at 959.) William and Jacqueline married in 1994. (Id.) William represented, and several regional newspapers reported, that he sold Direct Insurance for more than $600 million in 2007. (Tr. Beydler, ECF No. 181 at 1042, 1168; see Tr. Ex. 20.) More than a dozen articles published in various regional newspapers between 2007 and 2017 reported that William was "[o]ne of the Mid-South's wealthiest self-made men" and that he owned vast tracts of land in western Tennessee and northern Mississippi. (Tr. Ex. 20.)

William settled and funded The William C. Adair, Jr. Trust (the "Trust") in 1992. (ECF No. 175 at 959.) The beneficiaries of the Trust were William's four children and his grandson. (Tr. Bishop, ECF No. 181 at 1102.) William's daughters, Tammy Adair and Lacey Adair Bishop, were the Trust's co-trustees. (Id. at 1103.) The Trust was dissolved in 2016, and its assets were distributed to five separate trusts. (Id.) William has never had the authority to speak for, to bind, or to negotiate on behalf of the Trust. (Id. at 1083-90; Tr. Exs. 12, 13.) William does not

4

have a close relationship with Tammy and Lacey, and he has not spoken to them for several years. (Tr. Ex. 17 at 18–19.)

In 2007, Jacqueline and the Trust bought the Twin Hills Ranch, a 3,100-acre tract of land in Fayette County, Tennessee, and Marshall County, Mississippi. (ECF No. 175 at 959; Tr. Ex. 17 at 28.) The Trust owned an eighty percent undivided interest in the Twin Hills Ranch property, and Jacqueline owned the remaining twenty percent undivided interest. (Id.) The Trust and Jacqueline originally intended to build a residential subdivision on the property. (Tr. Wm. Adair, ECF No. 183 at 1524.)

Around that time, the Norfolk Southern Railroad Company announced plans to build an intermodal railyard in Fayette County. (See Tr. Beydler, ECF No. 181 at 1019.) Although Fayette County leaders supported the proposal, many residents complained that the planned location would cause excessive construction, traffic, and noise. (See id. at 1020.)

Dwain Beydler, a member of the Fayette County Regional Planning Commission, learned that the community resistance to the railyard's planned location was putting the Norfolk Southern deal in doubt. (Id. at 1019.) Beydler called Donnie Leggett because "it is well-known that [Leggett] was basically on top of everything that's going on in [Fayette] County." (Id. at 1021.) At various times, Leggett had served as a County Commissioner in Fayette County, as the President of the Fayette County Chamber of Commerce,

and as a member of the Fayette County Industrial Development Board. (Id. at 1451–52.)

Beydler and Leggett met to determine whether an alternative location for the railyard was possible. (Id. at 1021–22.) They identified a 500-acre tract of land on the Twin Hills Ranch that they believed belonged to William, based on news reports and anecdotal statements. (Id. at 1022–23.) Beydler and Leggett reached out to William and to representatives at Norfolk Southern and told them that they had a possible solution. (Id. at 1024, 1026.)

On December 17, 2008, Beydler and Leggett met with William and Norfolk Southern representatives and presented their proposal to relocate the railyard to what they believed was William's property. (Id. at 1027.) The proposal was a success. Norfolk Southern bought the 500-acre tract one year later. (See Tr. Ex. 28.) During that time, William told B&L that he owned the Twin Hills Ranch. (Tr. Beydler, ECF No. 181 at 1023, 1073, 1137.) William never told Beydler and Leggett that he had no ownership interest in the land that Norfolk Southern bought. (Tr. Beydler, ECF No. 181 at 1073.) Beydler and Leggett never saw the purchase agreement with Norfolk Southern that identified the Trust and Jacqueline as the land's owners. (See id. at 1124.) Newspapers reported at the time that Norfolk Southern was buying William's land. (Tr. Ex. 20.)

Because of the success of the Norfolk Southern deal, the focus of development on the remaining portion of the Twin Hills Ranch became building an "industrial, commercial, and logistics park," (the "Logistics Park"), rather than a residential subdivision. (Tr. Wm. Adair, ECF No. 183 at 1525.) Beydler and Leggett orally promised William to continue consulting on the project. (Tr. Beydler, ECF No. 181 at 1012.) In return, William orally promised to pay Beydler and Leggett a portion of the land sales that closed on the property. (See id.) Beydler and Leggett established Plaintiff B&L Management Group, LLC on August 19, 2009. (ECF No. 175 at 959.) Beydler and Leggett are B&L's sole members. (Id. at 1007.) William was B&L's only client. (Id. at 1112.)

On December 31, 2009, shortly after the Norfolk Southern deal closed, the William C. Adair Development Company, LLC wrote B&L a check for $25,000.00. (Tr. Ex. 9.) Although Beydler and Leggett had not discussed compensation in that amount with William, B&L accepted the check. (Tr. Beydler, ECF No. 181 at 1037.) William told Beydler that the check was "recognition for the work that [Beydler and Leggett had] done with Norfolk Southern." (Id.) Beydler, Leggett, and William discussed memorializing the terms of their oral agreement, but the parties did not agree on a written contract until 2011. (Id.) William told Beydler and Leggett "many times" that William was "going to make [them] millionaires." (Id. at 1037—38.)

Between 2009 and 2011, Beydler and Leggett continued to work for William and encouraged him to memorialize their oral contract in writing. (Tr. Beydler, ECF No. 181 at 1012–13.) On February 15, 2011, an attorney representing William sent William a first draft of the document that would become the written contract memorializing the parties' oral agreement. (Tr. Ex. 24.) This first iteration of the contract between the parties purported to be an agreement among WCA Development Company, Tammy Adair as trustee of the Trust, Jacqueline Adair, and B&L Management Group, LLC. (Tr. Ex. 24.) This first iteration says that the 746 acres comprising the Logistics Park is owned jointly by the Trust and Jacqueline. (Id.)

William made handwritten notes on this document, directing his attorney to include an additional paragraph, reading: "This contract is solely between WCA Dev. & B&L Mgmt. In the event WCA Dev Co. should lose its marketing agreement with owners, this contract will terminate at that time." (Tr. Ex. 25.) An undated subsequent iteration of the contract incorporated William's handwritten changes. (See Tr. Ex. 26.) This iteration also removed any reference to the Trust and Jacqueline and did not indicate who owns the Logistics Park. William testified that he removed the names of the true owners from the agreement. (Tr. Wm. Adair, ECF No. 182 at 1269.) The parties are identified as WCA Development Company, LLC and B&L Management Group, LLC. (See Tr. Ex. 26.)

This iteration also says that WCA Development Company, LLC has an agreement to market the Logistics Park. (See id. ¶ 1.) At trial, William testified that he never had a marketing agreement for any of the land. (Tr. Wm. Adair, ECF No. 182 at 1265.)

In May 2011, William presented B&L with the final iteration of the proposed contract. (Tr. Ex. 1.) The document was titled "B&L Management Group, LLC Consulting Fee Agreement with WCA Development Company, LLC." (Tr. Ex. 1.) This document (the "Contract") names "William C. Adair, dba, WCA Development Company, LLC" and "B&L Management Group LLC" as the parties to the agreement. (Id.) "WCA Development Company, LLC" has never been a registered limited liability company in Tennessee or Mississippi. (ECF No. 175 at 959.) The third recital says that William desires to continue to use the "economic development and site selection consulting services" of B&L. (Tr. Ex. 1.) The Contract does not refer to a marketing agreement. The Contract says that:

> WCA Development Company, LLC agrees to use and B&L Management Group, LLC agrees to provide economic development and site selection referral consulting services to develop and build facilities within the commercial, industrial and logistics development of WCA Development Company, LLC located on approximately 426 acres in the City of Rossville, in the County of Fayette, Tennessee and approximately 320 acres located in Marshall County, Mississippi.

(Id. ¶ 1.).

The Contract provides that "WCA Development Company, LLC, will compensate B&L Management Group, LLC, for all economic development consulting and site selection referral consulting services rendered before and after the date of this agreement." (<u>Id.</u> ¶ 2.)  It provides that B&L will receive a consulting fee for all services provided to the WCA Development Company, LLC in the amount of fifteen percent of the sales price of any land sold within the acreage described in the Contract. (<u>Id.</u>)  The Contract specifically says that:

> WCA Development Company, LLC shall add 15% to the Sales Price . . . [and] [t]his 15% shall be paid to B&L Management . . .; B&L Management will pay the following expenses from the proceeds received from WCA Development Company, LLC:
> 1) Commissions due to Real Estate Agents or Developers as mutually agreed to by WCA and B&L,
> 2) B&L will be responsible for its own expenses related to marketing and consulting.

(<u>Id.</u> ¶ 2(a)-(b).)

The parties never "mutually agreed" to pay any commissions to real estate agents or developers. (<u>See</u> Tr. Ex. 23 ¶ 9.)  On June 22, 2011, Beydler and Leggett signed the Contract on behalf of B&L.  (Tr. Ex. at 5.)  William signed the Contract on August 1, 2011, under the heading "The WCA Development Company, LLC," and above the title "Owner." (<u>Id.</u>)

B&L continued consulting for William until 2016. (<u>See</u> Tr. Beydler, ECF No. 181 at 113.)  At trial, B&L produced more than

3,000 pages of research that it had prepared for William. (Tr. Ex. 10.) Beydler said that this production reflected only a small amount of the research that B&L did for William. (Tr. Beydler, ECF No. 181 at 1045.) B&L provided William with consulting services on matters including the economic needs of Fayette County, the biomass industry, water and wastewater treatment authorities, design guidelines for residential and commercial developments, energy efficiency and environmental issues in logistics parks, foreign trade zone status, public-private partnerships, and large-scale development grants. (Id. at 1044—66.)

Leggett testified that he met with William weekly to discuss B&L's work on the Logistics Park. (Tr. Leggett, ECF No. 183 at 1457—65.) Sometimes, Beydler came to the meetings. (Id.) In addition to his consulting work, Leggett met with Fayette County government officials on William's behalf. (Id. at 1457—65.) William never told B&L to stop working or that their services were no longer needed. (ECF No. 175 at 960.) Between 2009 and 2016, no land sold in the park and William did not pay B&L for any of its consulting services. (See Tr. Beydler, ECF No. 181 at 1068-69.) When asked why he would continue working for William for so long without being paid, Beydler said that: "From the beginning . . . we knew based on what [William] said that he had to sell the land and that he would be able to pay us when the land was sold. We believed him. We believed him enough,

and we believed in Fayette County. . . We knew the land would sell. So, we look[ed] at it in terms of an investment in our future, in our retirement basically." (Id. at 1069.)

In 2016, Beydler and Leggett learned that Tire and Battery Company had bought land in the Logistics Park. (Tr. Leggett, ECF No. 183 at 1502.) Beydler and Leggett went to William's office and asked William to pay B&L fifteen percent of the proceeds from that sale in accordance with the Contract. (Tr. Beydler, ECF No. 181 at 1068.) William gave Leggett a $6,946.00 check payable to B&L. (Id. at 1070; Tr. Ex. 11.) Beydler said that he and Leggett were "stunned" that the amount was so low, but they accepted the check and left William's office. (Tr. Beydler, EF No. 181 at 1071.) William testified that the check was intended as "a token" to compensate Leggett for persuading Fayette County to lower the building permit fees that Tire and Battery Company had to pay. (Tr. Wm. Adair, ECF No. 183 at 1545, 1588; Tr. Ex. 17 at 192.) William could not explain how he calculated the precise amount. (Id. at 1588.) When Leggett later confronted William and asked why William had not paid B&L fifteen percent of the land sale proceeds as the Contract required, William told him: "I cannot honor this contract. Why would I -- why in the hell would I sign something like this?" (Tr. Leggett, ECF No. 183 at 1470.)

Leggett visited William again to address B&L's compensation from the sale to Tire and Battery Company. (Id.) William told

Leggett that "[w]e'll just let a judge decide this," and berated Leggett with foul language. (Id. at 1471.) The next day, William called Leggett to apologize for his conduct and invited Leggett to write a memorandum explaining how much money William owed B&L under the Contract. (Id. at 1472.) Leggett did so and delivered the memorandum to Mike Medling ("Medling"), William's office manager. (Id.) William reviewed Leggett's proposal and then called Leggett to give him "a royal cussing." (Id.) William told Leggett: "You know, well, I'll just file bankruptcy. Y'all won't get a GD thing. You know, I'm not paying you SOBs nothing, much less that bogus partner of yours." (Id. at 1472–73.)

B&L stopped providing consulting services to William at this time. (See Tr. Beydler, ECF No. 181 at 113.) Beydler and Leggett decided to begin litigation against William and hired an attorney. (Id. at 1072.) Beydler researched the ownership of the 746 acres described in the Contract and learned that William did not own any of the land comprising the Logistics Park. (Id.) Beydler and Leggett discovered that the land belonged to the Trust and Jacqueline. William never owned any land on the Twin Hills Ranch property, including the Logistics Park, and he has not owned any real property "for quite a few years." (Tr. Wm. Adair, ECF No. 182 at 1242, 1253–54.)

Although William represented, and newspapers reported, that he was one of the wealthiest men in Tennessee, William adopted his

deposition testimony that he lives on the income from his 401k and
social security.  (Id. at 1276.)  William also adopted his testi-
mony that he withdrew money from the William C. Adair Development
Company, LLC to cover his living expenses, but that the LLC had
held no assets since at least 2017 and that it had since been
dissolved.  (See id. at 1276-78; Tr. Ex. 18.)

William has been the sole member of several single-member
LLCs.  They include the William C. Adair Development Company, LLC,
the Piperton Supply Company, LLC, the Piperton Hills Phase 1, LLC,
and the Rossville Supply Company, LLC.  William also owns Grandview
Plantation, a cattle operation, as a sole proprietorship.  (Tr.
Wm. Adair, ECF No. 183 at 1559.)  By 2017, William had sold all of
the cattle he had owned.  (Tr. Wm. Adair, ECF No. 183 at 1714.)
Jacqueline acted as bookkeeper for all of William's entities.  (ECF
No. 175 at 961; Tr. J. Adair, ECF No. 182 at 1409; Tr. Wm. Adair,
ECF No. 183 at 1527.)  Her training in accounting consists of "some
college classes" and an internship she completed in 1980.  (Tr. J.
Adair, ECF No. 182 at 1410.)  Jacqueline and Medling had the
authority to write checks on William's corporate bank accounts for
these entities.  (ECF No. 175 at 961; Tr. Medling, ECF No. 182 at
1212.)

Between 2010 and 2017, Jacqueline and Medling wrote hundreds
of checks transferring millions of dollars among William's various
entities.  (ECF No. 175 at 961; see Tr. Ex. 32.)  Most of the

transactions involved the transfer of funds from one of William's single-member LLCs to another of William's single-member LLCs. (See Tr. Ex. 32.) When she was asked about instances in which she transferred funds among William's entities, Jacqueline said that she would do so whenever one of the entities was under-capitalized and needed to pay bills. (Tr. J. Adair, ECF No. 183-1 at 1762—63.) Medling gave the same testimony. (Tr. Medling, ECF No. 182 at 1213.) When asked about certain transfers lacking any discernible purpose, Jacqueline said that she could not recall the circumstances of each transfer, but that certain transfers were likely to be accounting mistakes. (Tr. J. Adair, ECF No. 183 at 1413.)

Jacqueline was specifically asked about the purpose of forty-three checks that she had signed and that B&L's counsel asked its expert witness to review. (Tr. J. Adair, ECF No. 183-1 at 1727—34.) Jacqueline provided legitimate explanations for each of the transactions or said that she could not remember the purpose of the check. (See id.)

B&L's accounting expert, Dr. Zabihollah Rezaee, examined the transfers and described them as "red flags" constituting "a pattern of irregularities" that suggested fraud. (Tr. Rezaee, ECF No. 182 at 1336.) Rezaee testified that the transactions among William's entities were so complex and poorly recorded that he could not make sense of them. (Id. at 1344-45.) Rezaee ultimately

concluded, however, that he could not "prove with the evidence put in front of [him] that fraud occurred . . . ." (Id. at 1351.)

B&L filed this suit on March 20, 2017. (Compl., ECF No. 1.) It filed a Second Amended Complaint on April 5, 2018. (ECF No. 128.) B&L brings two claims: (1) an intentional misrepresentation claim against William; and (2) a civil conspiracy claim against William and Jacqueline. B&L pursues both claims under Tennessee common law. It seeks compensatory and punitive damages.

## III. Conclusions of Law

### A. William's Personal Liability

The parties dispute whether William can be held personally liable. B&L argues that he can, and Defendants contend that only William's LLC can be liable. The dispute arises from inconsistent language in the Contract. It refers to B&L's contractual counterpart in three different ways.

First, the Contract's title identifies the parties as "B&L Management Group, LLC" and "WCA Development Company, LLC." (Contract, Tr. Ex. 1.) William has never registered an entity named "WCA Development Company, LLC." (Tr. Wm. Adair, ECF No. 182 at 1544.) An entity named "William C. Adair Development Company, LLC" was a registered LLC in Tennessee when the Contract was signed. (Tr. Ex. 23 at ¶ 23; Tr. Ex. 18.) Second, the first paragraph of the Contract refers to the first party to the agreement as "William C. Adair, dba, WCA Development Company, LLC."

(Contract, Tr. Ex. 1.)  Third, William signed the Contract as "Owner" of "The WCA Development Company, LLC." (Id.) William dated the document August 1, 2011, and made an illegible handwritten note next to the date. (See id. at 3.) He testified that the note reads "Pres", an abbreviation for "President." (Tr. Wm. Adair, ECF No. 182 at 1544.)

Defendants argue that William signed the Contract on behalf of William C. Adair Development Company, LLC and that he cannot be personally liable for damages under the Contract. B&L responds that William purported to sign on behalf of WCA Development Company, LLC, a nonexistent entity, and therefore William is personally liable. B&L also argues that the abbreviation "dba" in "William C. Adair, dba, WCA Development Company, LLC" shows William's intent to be personally bound under the Contract. Defendants respond that the use of "WCA" as an abbreviation for "William C. Adair" does not mean that William was attempting to contract on behalf of a nonexistent entity.

The Court need not address the parties' arguments. A member of an LLC "is an agent of the LLC for the purpose of its business, and the act of every member, including the execution in the LLC name of any instrument . . . binds the LLC . . . ." Tenn. Code Ann. § 48-238-103; see also Lascassas Land Co., LLC v. Allen, 2018 WL 1733449, at *6 (Tenn. Ct. App. Apr. 10, 2018). Ordinarily, an agent is not personally liable on a contract he makes in the name

of his disclosed principal. ICG Link, Inc., v. Steen, 363 S.W.3d 533, 550 (Tenn. Ct. App. 2011). An agent who signs a contract on behalf of a fictitious or nonexistent principal may be held personally liable for damages under the contract. Co. Stores Dev. Corp. v. Pottery Warehouse, Inc., 733 S.W.2d 886, 888 (Tenn. Ct. App. 1987); Fed. Deposit Ins. Corp. v. Morrison, 816 F.2d 679, n.3 (6th Cir. 1987); see also Restatement (Third) of Agency, § 6.04 (2006).

Agency status is not a shield against personal liability for the agent's torts, including fraud and misrepresentation. Gross v. McKenna, 2007 WL 3171155, at *4 (Tenn. Ct. App. Oct. 30, 2007); Brungard v. Caprice Records, Inc., 608 S.W.2d 585, 590-91 (Tenn. Ct. App. 1980); see also Tenn. Code Ann. § 48-217-101(a)(3). An actor is subject to personal liability for fraud and misrepresentation even when he acts as an agent. See Restatement (Third) of Agency § 7.01 (2006).

B&L argues that it relied on William's representations that he owned the Logistics Park and that he had the authority to sell land there. B&L contends that those representations were tortious falsehoods. Because an agent is liable for his own acts of fraud and misrepresentation, regardless of the scope of his agency, the Court need not decide whether William was acting as an agent for William C. Adair Development Group, LLC when he signed the Contract. See Brungard, 608 S.W.2d at 590; Allied Sound, Inc. v.

*Neely*, 909 S.W.2d 815, 821 (Tenn. Ct. App. 1995). William's liability does not depend on his status as an agent.

### B. Past Consideration

Under Tennessee contract law, past consideration cannot serve as legal consideration for a subsequent promise. *Bratton v. Bratton*, 136 S.W.3d 595, 607 (Tenn. 2004). Defendants argue that the Contract is invalid because it is not supported by new consideration. Defendants represent that the Contract further compensates B&L for its efforts in securing the Norfolk Southern deal and that William paid B&L $25,000 for those efforts before signing the Contract. They contend that the compensation provisions of the Contract would pay B&L for work on the Norfolk Southern deal, for which it had already been paid, and are past consideration.

Assuming that Defendants' characterization of the compensation provisions of the Contract were correct, it would not affect the outcome of this case. This is a fraud action, not a breach of contract action. B&L need not show that there is a valid contract to succeed on its claims of intentional misrepresentation and civil conspiracy.

### C. Performance under the Contract

Under the Contract, B&L agreed to provide "economic development and site selection referral consulting services to develop and build facilities [at the Logistics Park]." (Tr. Ex. 1.) Defendants argue that B&L failed to perform under the Contract and

that they need not pay B&L for its services.  They contend that the Contract obligated B&L to find and refer prospective buyers who were interested in purchasing land at the Logistics Park.  B&L responds that the Contract did not require it to find buyers for Defendants' real estate.  B&L argues that the Contract obligated it only to provide consulting services and that it did so.

As previously stated, this action sounds in fraud, not contract.  Sufficient performance under the Contract is not an element of B&L's intentional misrepresentation claim.  The Court need not determine whether B&L's consulting services constitute adequate performance under the Contract.

### D. Intentional Misrepresentation

B&L brings a claim for intentional misrepresentation against William.[2]  (See ECF No. 186 at 1888.)  To succeed, B&L must prove: (1) that the defendant made a representation of a present or past fact; (2) that the representation was false when it was made; (3) that the representation involved a material fact; (4) that the defendant either knew that the representation was false or did not believe it to be true or that the defendant made the representation

---

[2] The parties refer to B&L's cause of action as "fraud."  The Tennessee Supreme Court has said that intentional misrepresentation and fraud "are different names for the same cause of action," and in cases involving those torts, it "suggest[s] that th[e] term [intentional misrepresentation] should be used exclusively."  Hodge v. Craig, 382 S.W.3d 325, 342-43 (Tenn. 2012). The Court will treat B&L's cause of action for fraud as one for intentional misrepresentation.

recklessly without knowing whether it was true or false; (5) that the plaintiff did not know that the representation was false when made and was justified in relying on the truth of the representation; and (6) that the plaintiff sustained damages as a result of the representation. Hodge, 382 S.W.3d 343 (citing Walker v. Sunrise Pontiac-GMC Truck, Inc., 249 S.W.3d 301 (Tenn. 2008)).

Fraud "is never presumed," and the facts sustaining it "must be clearly made out." Dog House Invs., LLC v. Teal Props., Inc., 448 S.W.3d 905, 916 (Tenn. Ct. App. 2014); see also Watson v. Watson, 2010 WL 5549050, at *8 (Tenn. Ct. App. Dec. 29, 2010) (noting that fraud must be proved by "clear and convincing evidence").

### 1. Representation, Falsity, and Knowledge of the Representation's Falsity

William told B&L that he owned the Logistics Park. (Tr. Beydler, ECF No. 181 at 1023, 1073, 1137.) William also directed his former attorney to change an earlier version of the Contract so that it omitted the names of the Logistics Park's true owners. (Tr. Wm. Adair, ECF No. 182 at 1269.) William admitted that he knew when he made those representations that he did not own the Logistics Park and that he did not have the authority to sell land at the Logistics Park. (Id. at 1270.)

William represented to B&L that he owned the Logistics Park. Those representations were false. William knew that those

representations were false when he made them. B&L has proven elements one, two, and four by clear and convincing evidence.

### 2. Materiality

To succeed, B&L must prove that the false representations were about a material fact. Hodge, 382 S.W.3d at 343. A fact is material when it is "significant or essential to the issue or the matter at hand." Abdulsayed v. Hand, 2012 WL 5577298, at *4 (Tenn. Ct. App. Nov. 14, 2012) (quoting Black's Law Dictionary 484 (7th ed. 2000)) (internal quotations omitted).

William's representations that he owned the Logistics Park were material. B&L would not have agreed to consult for William if it had doubted that William owned the land. Under the Contract, B&L did not receive an hourly fee or a lump sum for its services. B&L's compensation under the Contract turned on William's ability to set the price of land sold at the Logistics Park. When a parcel was sold, William agreed to mark up the sales price by fifteen percent and pay B&L the fifteen percent markup. If B&L had known that William lacked the authority sell land at the Logistics Park, and consequently lacked the ability to pay compensation for B&L's services, B&L would not have agreed to provide consulting services to William. B&L has established element three by clear and convincing evidence.

### 3. Reliance

B&L must show that it did not know that (1) William's representations were false and (2) that its reliance on William's representations was reasonable.  _Hodge_, 382 S.W.3d at 343.  B&L has proved the first prong.  Neither Beydler nor Leggett knew that William did not own the Logistics Park.  (_See_ Tr. Beydler, ECF No. 181 at 1023; Tr. Leggett, ECF No. 183 at 1453.)  B&L did not know that William's representations were false.

To evaluate the reasonableness of a plaintiff's reliance on a misrepresentation, Tennessee courts consider the following factors: (1) the plaintiff's business expertise and sophistication; (2) the existence of a longstanding business or personal relationship between the parties; (3) the availability of the relevant information; (4) the existence of a fiduciary relationship; (5) the concealment of the fraud; (6) the opportunity to discover the fraud; (7) which party initiated the transaction; and (8) the specificity of the misrepresentation.  _Pitz v. Woodruff_, 2004 WL 2951979, at *10 (Tenn. Ct. App. Dec. 17, 2004).

William grew up in Collierville, Tennessee, a town close to the Twin Hills Ranch, and  became a "well-known regional businessman."  (ECF No. 175 at 959.)  William represented, and newspapers reported, that he sold the company that he founded for more than $600 million.  (Tr. Beydler, ECF No. 181 at 1042, 1168; _see_ Tr. Ex. 20.)  From 2007 to 2011, six articles in regional newspapers

reported that William owned the Twin Hills Ranch. (See Tr. Ex. 20.) From 2008 to 2009, Beydler and Leggett worked with William to secure a deal with Norfolk Southern to build an intermodal railyard at the Twin Hills Ranch. Throughout that process, William told Beydler and Leggett that he owned the Twin Hills Ranch, and he did not tell them that Jacqueline and the Trust were the true owners. (See Beydler, ECF No. 181 at 1073.) When the Norfolk Southern deal closed, newspapers reported that Norfolk Southern was buying William's land. (See Tr. Ex. 20.) Leggett testified that he trusted William because of William's reputation in the community and Leggett's own experience working with William. (Tr. Leggett, ECF No. 183 at 1468, 1475, 1476.)

Given William's repeated representations, his reported wealth, and his ties to the community, it was not unreasonable for Beydler and Leggett to believe that William owned a large tract of land in western Tennessee and northern Mississippi. The numerous newspaper articles reporting that William owned the Twin Hills Ranch demonstrate that there was a widespread belief that William owned the land. William himself claimed to own the land, and he did not correct false reports to the contrary. B&L reasonably relied on William's representation that he owned the Logistics Park.

Defendants argue that B&L could not reasonably rely on William's representations because Beydler and Leggett could have

discovered the true owners of the Logistics Park by looking through public land records. The availability of land records, however, does not itself make reliance on a misrepresentation unreasonable. See Bagby v. Carrico, 1997 WL 772877, at *4 (Tenn. Ct. App. Dec. 9, 1997) ("Having misrepresented a material fact to one who had placed his trust in him, [the defendant] cannot now claim that the injured party should have independently discovered that he was not telling the truth."). A defendant who misrepresents a material fact to another may not invoke the doctrine of constructive notice to avoid liability. See Scott v. Johnson, 52 Tenn. 614, 630 (1871); Houghland v. Houghland, 2006 WL 2080078, at *5 (Tenn. Ct. App. July 26, 2006); Hamilton v. Galbraith, 15 Tenn. App. 158, 175 (1932) ("One who practices bad faith upon another may not invoke the doctrine of constructive notice in aid of his own wrongdoing.").

Defendants contend that Beydler and Leggett should have known the true owners of the Twin Hills Ranch property because Leggett testified that he used tax maps of Fayette County to identify a site for the Norfolk Southern intermodal railyard. Defendants' argument is not well-taken. Although Beydler and Leggett used tax maps, the maps did now show who owned the land at issue. (Tr. Beydler, ECF No. 181 at 1022.)

### 4. Pecuniary Loss

In Tennessee, a party seeking monetary damages in a fraud action must show that it suffered pecuniary loss resulting from the defendant's misrepresentations. See City State Bank v. Dean Witter Reynolds, Inc., 948 S.W.2d 729, 738 (Tenn. Ct. App. 1996). Speculative damages cannot support a cause of action for fraud. See Saltire Indus., Inc. v. Waller, Lansden, Dortch & Davis, PLLC, 491 F.3d 522, 531 (6th Cir. 2007) (citing Anderson-Gregory Co. v. Lea, 370 S.W.2d 934, 937 (Tenn. Ct. App. 1963) (noting that "it is the rule that speculative damages cannot be recovered")). According to the Restatement (Second) of Torts, "[o]ne who fraudulently makes a misrepresentation of fact . . . is subject to liability to the other in deceit for pecuniary loss caused to him by his justifiable reliance upon the misrepresentation." § 525 (1977); see also Restatement (Third) of Torts: Liability for Economic Harm § 9 cmt. b(3) (Am. Law Inst., Tentative Draft No. 2, 2014) ("Damages awarded in tort for fraud may be measured on an 'out of pocket' basis").

William did not pay B&L for its consulting services in accordance with the compensation provisions of the Contract. William paid B&L approximately $6900, which is far less than fifteen percent of the land sales that had occurred at the Logistics Park. (See infra Section III.F Damages) That loss of income is a pecuniary loss. B&L has proven that it suffered a pecuniary loss.

The six elements of intentional misrepresentation are satisfied.  B&L's claim against William for intentional misrepresentation is GRANTED.

### E. Civil Conspiracy and Fraudulent Transfers

B&L presented evidence of hundreds of financial transfers among William, Jacqueline, and various business entities that William controlled.  Those transfers are listed in Trial Exhibit 32.  B&L contends that the transfers that it identifies establish a civil conspiracy by which Defendants defrauded B&L.

A civil conspiracy is "a combination of two or more persons who, each having the intent and knowledge of the other's intent, accomplish by concert an unlawful purpose, or accomplish a lawful purpose by unlawful means, which results in damage to the plaintiff."  Nippert v. Jackson, 860 F. Supp. 2d 554, 566 (M.D. Tenn. 2012) (quoting Trau-Med of Am., Inc. v. Allstate Ins. Co., 71 S.W.3d 691, 703 (Tenn. 2002) (internal quotations omitted).  The elements are: (1) a common design between two or more persons; (2) to accomplish by concerted action an unlawful purpose, or a lawful purpose by unlawful means; (3) an overt act in furtherance of the conspiracy; and (4) resulting injury.  Kincaid v. SouthTrust Bank, 221 S.W.3d 32, 38 (Tenn. Ct. App. 2006).

Civil conspiracies are "rarely proven directly."  First Cmty. Bank, N.A. v. First Tenn. Bank, N.A., 489 S.W.3d 369, 396 (Tenn. 2015) (internal quotations omitted).  They are usually established

using circumstantial evidence and "inferences drawn from the evidence, coupled with common-sense knowledge of the behavior of persons in similar circumstances." Id. (internal quotations omitted). Fact-finders may consider "the nature of the acts themselves, the relationship of the parties, the interests of the conspirators, and other circumstances." Stanfill v. Hardney, 2007 WL 2827498, at *8 (Tenn. Ct. App. Sept. 27, 2007). The circumstantial evidence suggesting the existence of a civil conspiracy "must create more than a suspicion or conjecture that a conspiracy exists. It must enable reasonable persons to infer that two or more persons jointly assented to accomplish" the goal of the conspiracy. Id.

Participation in a civil conspiracy is not, by itself, an independent tort. Id. at *7. It is a derivative claim that requires the plaintiff to prove that an underlying predicate tort was committed in furtherance of the conspiracy. Aegis Scis. Corp. v. Zelenik, 2013 WL 175807, at *7 (Tenn. Ct. App. Jan. 16, 2013). If the underlying tort is not proven, the conspiracy claim fails. See Watson's Carpet & Floor Coverings, Inc. v. McCormick, 247 S.W.3d 169, 180 (Tenn. Ct. App. 2007) (citing Forrester v. Stockstill, 869 S.W.2d 328, 330 (Tenn. 1994)). Here, B&L asserts that Defendants engaged in a conspiracy to defraud it by fraudulently transferring funds.

Tennessee has adopted the Uniform Fraudulent Transfer Act. Tenn. Code Ann. §§ 66-3-301, et seq. The Act provides remedies to creditors when debtors fraudulently transfer assets to third parties.[3] Tennessee recognizes two types of fraudulent transfers: (1) actual fraud, codified at Tenn. Code Ann. § 66-3-305(a)(1); and (2) constructive fraud, codified at Tenn. Code Ann. §§ 66-3-305(a)(2) and 66-3-306. "Constructive fraud is essentially fraud without the element of intent." Kincaid, 221 S.W.3d at 39.

The parties to a civil conspiracy must have a specific intent to accomplish the underlying tort. See id.; see also 15A C.J.S. Conspiracy § 15. Because constructive fraud requires no proof of intent, a defendant who commits constructive fraud will not have the requisite specific intent to be liable for civil conspiracy. Making a constructive fraudulent transfer is not an underlying wrong that can sustain a civil conspiracy claim. See Nippert, 860 F. Supp. 2d at 566 (under Tennessee law, as predicted by the district court, conspiracy to commit constructive fraud is a legal impossibility); Summers v. Hagen, 852 P.2d 1165, 1170 (Alaska 1993) (holding that the defendant in a civil conspiracy case "must be

---

[3] B&L represents that the underlying tort of its civil conspiracy claim is fraudulent transfer under Tennessee common law. (See ECF No. 186 at 1895.) The cases cited by B&L do not recognize that tort, and the Court has found no Tennessee authority describing that tort at common law. B&L has also invoked Tennessee's Fraudulent Transfer Act, Tenn. Code Ann. §§ 66-3-301, et seq. The Court will treat B&L's civil conspiracy claim as predicated on a violation of that Act.

guilty of actual fraud, as opposed to constructive fraud." (internal quotations omitted)).

The Court has found no Tennessee authority resolving this issue, but one Tennessee court has recognized that "some states have held that conspiracy to commit constructive fraud is a legal impossibility because one cannot conspire to commit a[n] [act] for which he does not have the intent." Kincaid, 221 S.W.3d at 39 n.8 (concluding that it was unnecessary to reach the issue of whether the plaintiff's conspiracy to commit constructive fraud claim was a legal impossibility because it was deficient for other reasons). B&L's civil conspiracy claim can succeed only if B&L has proven that Defendants committed actual fraud under Tenn. Code Ann. § 66-3-305(a)(1).

Section 66-3-305(a)(1) provides, in pertinent part, that "[a] transfer made . . . by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made . . ., if the debtor made the transfer . . . [w]ith actual intent to hinder, delay, or defraud any creditor of the debtor." Tenn. Code Ann. § 66-3-305(a)(1). In determining whether there is actual intent, a court may consider, among other factors, whether:

    (1)   The transfer . . . was to an insider;
    (2)   The debtor retained possession or control of the property transferred after the transfer;
    (3)   The transfer . . . was disclosed or concealed;
    (4)   Before the transfer was made . . ., the debtor had been sued or threatened with suit;

(5) The transfer was of substantially all the debtor's assets;
(6) The debtor absconded;
(7) The debtor removed or concealed assets;
(8) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred . . .;
(9) The debtor was insolvent or became insolvent shortly after the transfer was made . . .;
(10) The transfer occurred shortly before or shortly after a substantial debt was incurred; and
(11) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Tenn. Code Ann. § 66-3-305(b). These statutory factors resemble the traditional "badges of fraud" identified by Tennessee courts. See Teague v. Kidd, 2017 WL 2299059, at *8 (Tenn. Ct. App. May 25, 2017).

B&L's civil conspiracy claim arises from William's representation, made at his deposition, that he owns no real property, has no significant assets, and lives on the income from his 401k and social security. (Tr. Ex. 17 at 22-24.) At trial, William was asked if he had made those representations and he said that he had. (Tr. Wm. Adair, ECF No. 182 at 1275—76.) William's financial condition appears to conflict with the widespread community perception that he was "[o]ne of the Mid-South's wealthiest self-made men," who received more than $600 million from selling his insurance company in 2007. (Tr. Ex. 20.) After reviewing the accounting records of William's business entities, B&L amended its

Complaint to allege that William transferred large amounts of money from his LLCs to Jacqueline in an attempt to defraud his creditors, including B&L. (See ECF No. 128 ¶¶ 73–88.) B&L asserts that Jacqueline then wrote hundreds of checks on William's LLC accounts to herself, other entities, family members, and friends to put that money beyond the reach of creditors. (Id. ¶ 75.) B&L alleges that William and Jacqueline also transferred millions of dollars among William's LLCs and his sole proprietorship without any legitimate purpose. (Id. ¶ 76.) B&L contends those transfers were an attempt to confuse the accounting records of William's business entities and hinder collection by B&L.

Between 2010 and 2017, William was the sole member of the following LLCs: William C. Adair Development Company, LLC, Piperton Supply Company, LLC, Piperton Hills Phase 1, LLC, and Rossville Supply Company, LLC. William also owns Grandview Plantation, a cattle operation, as a sole proprietorship, although William has sold all of his cattle. (Tr. Wm. Adair, ECF No. 183 at 1559.) Jacqueline acted as the bookkeeper for all of William's entities. (JPTO, ECF No. 175 at 961; Tr. J. Adair, ECF No. 182 at 1409; Tr. Wm. Adair, ECF No. 183 at 1527.) Her training in accounting consists of "some college classes" and an internship that she completed in 1980. (Tr. J. Adair, ECF No. 182 at 1410.) Jacqueline and Medling, William's office manager, had the

authority to transfer funds from the various entities' bank accounts. (ECF No. 175 at 961; Tr. Medling, ECF No. 182 at 1212.) Jacqueline and Medling wrote hundreds of checks transferring millions of dollars among William's various entities. (JPTO, ECF No. 175 at 961; see Tr. Ex. 32.) Most of those transactions were transfers of funds from one of William's single-member LLCs to another. (See Tr. Ex. 32.)

When Jacqueline was asked about specific transfers at trial, she was able to describe legitimate business purposes for the transfers at issue. In particular, Jacqueline testified about the purpose of forty-three checks that she had signed and that B&L had labeled suspicious. (Tr. J. Adair, ECF No. 183-1 at 1727—34.) She provided legitimate explanations for each of the transactions or said that she could not remember the purpose of the check. (See id.) She explained, for example, that she wrote one check to herself on the William C. Adair Development Company, LLC account as reimbursement for a printer that she had bought with her personal credit card. (Id. at 1728.) Another check reimbursed Jacqueline for business taxes that she had paid on the business's behalf. (Id. at 1729.) Jacqueline wrote another check transferring the proceeds of a cattle sale from the William C. Adair Development Company, LLC account to the Grandview Plantation account. (Id. at 1730.) The proceeds of that sale had been deposited in the wrong account, and the transfer corrected the mistake.

(Id.) Jacqueline gave similar legitimate explanations for forty other checks. The Court credits Jacqueline's explanations. B&L has not proved that the forty-three transfers listed in Trial Exhibit 32 were fraudulent transfers.

The Court heard extensive testimony about four checks that Jacqueline wrote to her father and uncle. (Tr. Exs. 35, 36.) On December 17, 2013, Jacqueline wrote two checks on the Piperton Hills Phase 1, LLC account to her father, Jack Payne. (Id.) The first was for $470,000.00 and contained a memo reading "Return of Capital." (Id.) The second check was for $14,100.00 and contained a memo reading "Interest." (Id.) Jacqueline also wrote two checks on the Piperton Hills Phase 1, LLC account on the same day to her uncle, Bruce Payne. (Tr. Ex. 35.) The first check to Bruce Payne was for $117,500.00 and contained a memo reading "Return of Capital." (Id.) The second check, also payable to Bruce Payne, was for $3,525.00 and contained a memo reading "Interest." (Id.)

Jacqueline said her father and uncle had originally invested in the residential development plans for the Twin Hills Ranch and that "William decided to return the capital because we weren't going to be able to do the residential which was what they invested in originally . . . ." (Tr. J. Adair, ECF No. 182 at 1423.) On the day before these checks were written, Jacqueline had transferred $605,125.00 from Grandview Plantation's account to the Piperton Hills Phase 1, LLC account to fund the transfers to her

father and uncle.  (Tr. Ex. 37.)  She explained that: "Piperton Hills didn't have enough money in it.  So, we moved it from one account to the other."  (Tr. J. Adair, ECF No. 182 at 1423.)

Although B&L's expert witness described these transactions as "red flags" suggesting fraud, the record corroborates Jacqueline's explanation that she was returning money that her father and uncle had invested.  (Tr. Rezaee, ECF No. 182 at 1348-1350.)  Rezaee seems to have based his opinion on the lack of documentary support for Bruce and Jack Payne's original transfers into one of William's entities.  (See id. at 1344.)  It is undisputed that the Trust and Jacqueline originally intended to build a residential subdivision on the Twin Hills Ranch when they bought the property in 2007.  (Tr. Wm. Adair, ECF No. 183 at 1524.)  Those plans changed in 2009 when the Norfolk Southern deal closed.  B&L's expert witness reviewed the accounting records of William's business entities going back to 2011.  (See Tr. Rezaee, ECF No. 182 at 1359.)  The expert witness did not have access to the accounting records at the time Bruce and Jack Payne would have made their investments in the residential subdivision plan, before the Norfolk Southern deal in 2009.  Jacqueline's explanation of the four checks is credible.  B&L has not established that they were fraudulent transfers.

The Court need not address the circumstances of each transfer described at trial or in the trial exhibits.  Ultimately, B&L has

not established that any one of the hundreds of individual transfers made over the course of seven years constituted a fraudulent transfer. B&L has not adequately supported its argument that the individual transfers, taken in the aggregate, were made with an actual intent to defraud B&L or any other creditor. B&L has failed to show how each of the transfers that it identifies triggers any of the factors that suggest actual fraud under Tenn. Code Ann. § 66-3-305(a). B&L relies on the opinions of its expert witness. Rezaee examined the accounting records for William's business entities and found that they contain "red flags" constituting "a pattern of irregularities" that could suggest fraud. (Tr. Rezaee, ECF No. 182 at 1336.) He concluded, however, that he could not "prove with the evidence put in front of [him] that fraud occurred . . . ." (Id. at 1351.) The Court agrees with Rezaee's assessment.

Although it is possible that the transfers identified by B&L constituted a fraudulent transfer scheme, it is as likely, if not more likely, that the transfers were innocent business activities, mistakes, and attempts to correct mistakes. The Court credits Jacqueline and Medling's explanations that most of the transfers were payments for legitimate business purposes or were intended to capitalize entities that were short of funds. To the extent certain transfers cannot be explained adequately, the Court finds that those transfers were innocent mistakes. Jacqueline kept the

books for William's large web of businesses, and she did not have extensive accounting experience. Certain unexplained transfers resulted from mistakes and inexperience, not a scheme to make William appear insolvent.

B&L asserts that the fraudulent transfer scheme began in 2010. (See Tr. Ex. 32.) William's debt to B&L first accrued in 2016, when Tire and Battery Company bought land in the Logistics Park. (See Tr. Leggett, ECF No. 183 at 1502; Tr. Wm. Adair, ECF No. 183 at 1586.) Accepting B&L's theory would mean that William and Jacqueline began conspiring to hinder B&L's collection of a debt six years before the debt existed. There is insufficient evidence to support that conclusion. There is also insufficient evidence to establish that William and Jacqueline conspired to hinder any other creditor.

B&L has not proven that the financial transfers listed in Trial Exhibit 32 were fraudulent under Tenn. Code Ann. § 66-3-305(a)(1). Because B&L has not proven an underlying tort or wrong, its civil conspiracy claim must fail.

### F. Damages

### 1. Compensatory Damages

In an intentional misrepresentation action, "the proper measure of the [plaintiff's] general damages is the benefit of the bargain rule." O'Keefe v. Gordon, 2013 WL 3149079, at *5 (Tenn. Ct. App. June 18, 2013) (quoting Haynes v. Cumberland Builders,

<u>Inc.</u>, 546 S.W.2d 228 (Tenn. Ct. App. 1976)).  The "benefit of the bargain" is the difference between the value of what the plaintiff would have received if the misrepresentation had been true and the actual value of what the plaintiff received.  <u>Id.</u>  That rule compels the defendant to make good on his false representations.  <u>Id.</u>

The Contract is the measure of damages here.  It establishes what B&L would have received if William's representations had been true.  The Contract provides that the "WCA Development Company, LLC" will pay B&L fifteen percent of the sales price of any land sold at the Logistics Park.  (<u>See</u> Contract, Tr. Ex. 1 ¶ 2(a).) The Contract says that "WCA Development Company, LLC shall add 15% to the Sales Price" and that "[t]his 15% shall be paid to B&L Management as specified in Article 2 Paragraph (a)." (<u>Id.</u> ¶ 2(b).) Under the Contract, B&L bears responsibility for the following expenses: (1) "Commissions due to Real Estate Agents or Developers as mutually agreed to by WCA and B&L"; (2) B&L's own expenses related to marketing and consulting; and (3) "fees owed to outside contractors which make referrals for specific developments within the" Logistics Park.  (<u>Id.</u> ¶¶ 2(c), 3.)  The parties never "mutually agreed" to pay any commissions to real estate agents or developers.  (<u>See</u> Tr. Ex. 23 ¶ 9.)  There is no proof of any fees owed to outside contractors.

B&L argues that it is entitled to fifteen percent of the total amount that all 746 acres of the Logistics Park would sell for if all acres were sold at $50,000 an acre. B&L represents that $50,000 is the highest per-acre sale price. B&L contends that it is entitled to compensation based on "the sale of the entire 746 acres described in the fraudulent document, even though all of those acres have not sold, because 1) Defendant William C. Adair never actually had the power to sell them in the first instance; and 2) because those specific promises of compensation were the representations upon which Plaintiff reasonably relied." (emphasis omitted).

B&L's argument is not well-taken. William promised to pay B&L fifteen percent of the land sales that occurred, not fifteen percent of the hypothetical sale price of the entire tract of land. B&L's right to compensation was triggered by a sale. Beydler acknowledged at trial that if no sales occurred, B&L would have no right to compensation. (See Tr. Beydler, ECF No. 181 at 1069 ("From the beginning of the outset we knew based on what [William] said that he had to sell the land and that he would be able to pay us when the land was sold.").) B&L's measure of damages also cannot be sustained because certain portions of the Logistics Park cannot be sold commercially. Parts of the Logistics Park are unusable for commercial and industrial purposes because of their environmental features. (Tr. Mercer, ECF No. 183 at 1622–23.)

Other parts of the land cannot be sold because they are set aside for roads, utility easements, retention ponds, and other infrastructure projects. (Id. at 1622.)

Defendants argue that the proper measure of damages is fifteen percent of the land sales that occurred between August 2011, when the Contract was executed, and May 25, 2016, when the parties effectively terminated their business relationship. Defendants represent that B&L presented evidence of only one sale that closed during that time: the sale of 82 acres to Tire and Battery Company for $1,503,470.00. Under Defendants' formulation, B&L is entitled to recover fifteen percent of that amount, $225,520.50, less the real estate broker's five percent commission.

The terms of the Contract constitute the measure of damages. Under the Contract, B&L was entitled to compensation for its services only once land had been sold at the Logistics Park. Giving B&L the benefit of the bargain means awarding it fifteen percent of the proceeds of the land sales that occurred at the Logistics Park while B&L was providing consulting services to William. B&L effectively stopped consulting for William on May 25, 2016, after the parties met to address B&L's compensation and could not agree on an amount. (See Tr. Beydler, ECF No. 181 at 113.)

B&L submitted proof of two sales of land at the Logistics Park that occurred before May 25, 2016:

> (1)  Tire and Battery Company bought 82 acres in 2016 at
>      $18,335 an acre, totaling $1,503,470.00; and
>
> (2)  Volvo bought 56 acres on April 30, 2016, for
>      $1,805,216.00.

(See Tr. Wm. Adair, ECF No. 183 at 1586.)  Those sales total
$3,308,686.00.[4]  Fifteen percent of that amount is $496,302.90.
Because William paid B&L $6,946.00 on May 25, 2016, its recovery
is reduced accordingly.  (Tr. Ex. 11.)  Under the Contract, B&L
was responsible for paying real estate brokerage commissions
"as mutually agreed to by WCA and B&L."  (Tr. Ex. 1
¶ 2(b)(1).)  Because the parties never "mutually agreed" to pay
any commissions to real estate agents, (see Def.'s Resp. to Pl.'s
Interrogatories, Tr. Ex. 23 ¶ 9), there is no reduction for bro-
kerage commissions.  B&L is entitled to recover $489,356.90 from
William on its claim for intentional misrepresentation.

## 2. Punitive Damages

Under Tennessee law, punitive damages may be awarded only if
a defendant has acted (1) intentionally, (2) fraudulently, (3)
maliciously, or (4) recklessly.  Hodges v. S.C. Toof & Co., 833
S.W.2d 896, 900-01 (Tenn. 1992); see also Tenn. Code Ann. §29-39-
104.  Punitive damages are reserved for the most egregious cases,
and the plaintiff must prove its entitlement to punitive damages
by clear and convincing evidence.  Id.  "Clear and convincing

---

[4] The latter sale is listed in the Land Sale Comparables Table, which
was introduced into the record as Trial Exhibit 16.

evidence" is defined as "evidence in which there is no serious or substantial doubt about the correctness or the conclusions drawn from the evidence." Id. at 901. The purpose of punitive damages is to punish the wrongdoer and to deter the wrongful conduct. Coffey v. Fayette Tubular Prods., 929 S.W.2d 326, 328 (Tenn. 1996).

B&L argues that the Court should award it $2,000,000.00 in punitive damages because William committed numerous fraudulent and other intentional bad acts. The Court has concluded that William defrauded B&L when he intentionally misrepresented his ownership of the Logistics Park. (See supra Section III.D) The Court has considered the following acts in determining whether an award of punitive damages is warranted:

(1) William's misrepresentation about his ownership of the Twin Hills Ranch, including the Logistics Park. (Tr. Beydler, ECF No. 181 at 1023, 1073, 1137.)

(2) William's history of misrepresenting his authority to third parties, including business people and government leaders, which required his daughter, a trustee of the Trust, to send letters correcting her father's misrepresentations. (See Tr. Exs. 12, 13.)

(3) William's misrepresentations to several regional newspapers about his personal wealth and his ownership of the Twin Hills Ranch. (See Tr. Ex. 20.)

(4) William's misrepresenting his ownership of the Logistics Park to a newspaper after this litigation had begun. (See Tr. Ex. 21.)

(5) William's false testimony that B&L drafted the Contract. (Tr. Wm. Adair, ECF No. 182 at 1257.)

(6) William's changes to the Contract to remove the names of the true property owners. (See Tr. Exs. 24, 25, 26.)

(7) William's changes to the Contract falsely representing that he had a marketing agreement with the property owners and therefore had authority to act on their behalf. (See id.)

(8) William's practice of obtaining work from B&L, knowing that B&L was performing services on his behalf, but refusing to compensate or terminate B&L. (Tr. Leggett, ECF No. 183 at 1465–66.)

(9) William's assertion at trial that the notices of dissolution for certain of his LLCs were forgeries when they were prepared and published by his co-defendant spouse and were stipulated by his attorney. (Tr. Wm. Adair, ECF No. 182 at 1232–33; Tr. J. Adair, ECF No. 182 at 1425.)

These episodes, taken together, demonstrate that William engaged in a pattern of fraudulent and intentional conduct. That pattern continued for at least six years. During that time, William obtained hundreds or thousands of hours of consulting services from B&L by false pretenses and false representations. William knew, or should have known, that Beydler and Leggett were sacrificing other business opportunities to work for William and that Beydler and Leggett depended on the eventual payout from the Logistics Park project to make up for income they were foregoing. William's acts of dishonesty were fraudulent and intentional and warrant an award of punitive damages.

Under Tennessee law, once a court determines that a defendant is liable for punitive damages, it must make specific findings supporting the amount of punitive damages. To the extent relevant, the court must specifically address each factor outlined by the

Tennessee Supreme Court in <u>Hodges</u>, 833 S.W.2d at 901, in assessing

the amount of punitive damages.  <u>Id.</u>  Those factors are:

(1) The defendant's financial condition and net worth;
(2) The reprehensibility of defendant's wrongdoing;
(3) The defendant's awareness of the harm being caused
    and defendant's motivation in causing the harm;
(4) The duration of defendant's misconduct and whether
    he tried to conceal the misconduct;
(5) The plaintiff's expense in recovering losses;
(6) Whether defendant profited from the activity;
(7) Whether the defendant has been subjected to previous
    punitive damage awards based upon the same act;
(8) Whether the defendant offered a prompt and fair set-
    tlement for harm caused; and
(9) Any other circumstances that bear on determining the
    proper amount of the punitive award.

<u>Id.</u> at 901–02.  Punitive damages may not exceed double compensatory

damages or $500,000, whichever is greater.  Tenn. Code Ann. § 29-

39-104(a)(5).

The Court finds as follows:

<u>1. Defendant's finances</u>: William testified that his and

Jacqueline's combined net worth is around $25 million "in cash and

land." (Tr. Wm. Adair, ECF No. 182 at 1281–82.)  The record does

not establish William's separate financial condition, which he

intentionally misrepresented during the parties' business rela-

tionship.  The Court cannot determine the state of William's fi-

nances.  Although evidence of a defendant's finances is a factor

to consider, it is not necessary for a plaintiff to present any

evidence of a defendant's financial condition to recover punitive

damages. See Anderson v. Latham Trucking Co., 728 S.W.2d 752, 754
(Tenn. 1987) ("[T]he plaintiff . . . may offer proof of the fi-
nancial condition of a defendant . . . but it is not essential or
mandatory that the record contain any such evidence to sustain an
award of punitive damages.").

2. Reprehensibility of defendant's conduct: Under Tennessee
law, the reprehensibility of the conduct is measured by the degree
of harm caused to the plaintiff. See Coffey, 929 S.W.2d at 332.
William's misrepresentations caused B&L significant financial
harm. Both Beydler and Leggett testified that they were willing
to forego other business opportunities only because they believed
that the eventual payout from the Logistics Park project would
help finance their retirements. Leggett testified that: "[L]ike
a lot of other people in 2008, when the stock market crashed, we
lost a good bit of our retirement money. I remember, when we got
this contract, I remember saying to my wife, you know, we'd lost
in 2008; but look what God has given us through this contract in
2011 to offset what we lost." (Tr. Leggett, ECF No. 183 at 1462.)
B&L has not been compensated for years of consulting work, and
Beydler and Leggett do not have the financial security that the
project would have afforded them. The degree of harm B&L suffered
and the reprehensibility of defendant's conduct are substantial.

3. Defendant's awareness of the harm and motivation: William
was aware of, or should have been aware of, the financial harm he

45

was causing B&L. William instructed B&L to continue performing services for more than six years, and he never terminated B&L. (Tr. Beydler, ECF No. 181 at 1183.) William knew, or should have known, that Beydler and Leggett were foregoing other opportunities to work for him. The Court will not speculate about William's motivations.

4. Duration of defendant's misconduct and whether he attempted to conceal it: William first misrepresented his ownership of the Logistics Park around 2008. (See Tr. Beydler, ECF No. 181 at 1023, 1073, 1137.) B&L did not learn the true owners of the land until 2016. (Id. at 1073.) William allowed B&L to continue their work on a false assumption during that time. William actively concealed the true ownership of the Logistics Park when he rewrote the Contract to eliminate the true owners. (Tr. Wm. Adair, ECF No. 182 at 1269.)

5. Expense plaintiff has borne in the attempt to recover the losses: B&L has spent an estimated $55,000 to $75,000 in pursuing its claims against Defendants. (Tr. Leggett, ECF No. 183 at 1476.)

6. Whether defendant profited from the activity: It is not clear whether B&L's consulting work produced any results for William. Many of the concrete efforts B&L made on William's behalf appear to have been unsuccessful. For example, the federal grant for which B&L applied to help develop the Logistics Park was denied. (Tr. Beydler, ECF No. 181 at 154.)

The water authority that B&L created for the Logistics Park was ultimately dissolved, in part, because there was no water supply. (Tr. Leggett, ECF No. 183 at 1489.) William did not use the application that B&L had prepared to gain Foreign-Trade Zone status for the Logistics Park, a designation that would confer certain tax advantages. (Tr. Leggett, ECF No. 183 at 1063.) The Court cannot conclude that the general research that B&L conducted for William benefitted the Logistics Park project.

7. Whether the defendant has been subjected to previous punitive damage award: There is no record of previous punitive damage awards.

8. Whether the defendant took remedial action or attempted to make amends: William initially showed a desire to settle B&L's claims when he invited Leggett to write a memorandum explaining how much money William owed B&L under the Contract. (Tr. Beydler, ECF No. 181 at 1472.) That effort was unsuccessful, however, and nothing in the record demonstrates that William has attempted to effect a prompt and fair settlement since then. Indeed, the record shows that William actively resisted a fair resolution.

9. Other circumstances: No party has identified other relevant circumstances.

Considering these factors, the Court finds that William is liable to B&L for $100,000.00 in punitive damages.

**IV.  Conclusion**

For the foregoing reasons, B&L's claim against William Adair for intentional misrepresentation is GRANTED.  B&L is entitled to $589,356.90 in damages from Defendant William Adair. B&L's claim against William and Jacqueline Adair for civil conspiracy is DENIED.

So ordered this 31th day of July, 2019.

/s/ *Samuel H. Mays, Jr.*
Samuel H. Mays, Jr.
UNITED STATES DISTRICT JUDGE